## HANDY GOVERNOR CORPORATION v. GENERAL CARBURETOR SALES CO., Inc.

### No. 8237.

District Court, E. D. New York.

May 5, 1938.

Gifford, Scull & Burgess, of New York City (George F. Scull, Harold F. Watson, and H. H. Hamilton, all of New York City, of counsel), for plaintiff.

Strauch & Hoffman, of Washington, D. C., and Ward, Crosby & Neal, of New York City (William A. Strauch and Rex P. Mulligan, both of Washington, D. C., of counsel), for defendant.

BYERS, District Judge.

These patents deal with a speed governing device installed in the conduit between the carburetor and the engine, of automobiles, buses, tractors, etc.

The intake stroke of the piston in the interior combustion gas engine cylinder creates suction in the manifold above the carburetor; into that conduit there is introduced a valve or gate, which is held in place by a shaft the ends of which are so engaged at the interior of the conduit that the valve can rotate about its axis; by reason of the higher degree of vacuum above the valve (toward the engine) than below, the valve tends to move across the conduit toward a closing position, and thus to reduce the flow of fuel from the carburetor to the engine. If the closure were complete, the fuel supply would be cut off, instead of being controlled.

Since the valve is designed as a speed control agent, it is necessary to prevent full closure. The problem is complicated by the additional fact that the closing tendency is not constant, but increases during the movement from the fully opened to the fully closed position, so that, since it is desired to maintain the valve in position between these two extremes, it is requisite to provide a countervailing force which will resist the closing tendency; this force must vary in intensity according to the demands made upon it.

A secondary impulse causing the valve to close, is the impact of the flow of fuel against the lower side of the valve or gate.

The practice has been employed in the plaintiff's devices under examination, of placing the axis off center, whereby one wing or section of the valve is larger than the other, and of necessity the mounting of the shaft in the conduit is also off center. Thus the valve is subject to two forces which tend to close it; the reduced pressure above it, and the fuel impact from below, which is unevenly distributed across the surface of the valve.

The evidence has covered a wide field, but it is necessary to center attention upon the problem of providing the variable offsetting force to oppose the closing tendency of the valve, so that the latter may be held within a desirable range of response to a predetermined speed (revolutions per minute), in order to ascertain whether the plaintiff's solution of the problem constitutes patentable invention; and whether the defendant's device is the same thing mechanically as the plaintiff's.

The limit of speed having been determined, the governing action consists in accommodating the fuel supply to the varying requirements of road conditions, such as change of grade and wind resistance. In other words, more power is required to move a given truck up-hill than on a level stretch of road, and the governor must admit of a change in the fuel supply up to the desired limit of speed, so that the requisite power may always be maintained.

The ideal result would indicate precision of governance, but practically that is not desired, for there must be a margin of tolerance or failure to govern, of from 10% to 15%, to meet road, traffic, and other operating conditions.

The governing device, as so designed, was operative so long as it was accepted by the drivers of buses and trucks as a desirable part of equipment; they discovered, however, that its function could be frustrated by disabling it through manipulation of the antecedent manually operated throttle valve. The latter is also a disc or gate, between the carburetor and the governor valve, the office of which is to control the volume of fuel emerging from the carburetor and presenting itself to the governor valve.

Under normal operation of the governor valve, the throttle valve is wide open; that is, it is parallel to the walls of the conduit. In that position, the flow of fuel is unimpeded and the pressure is substantially that of the atmosphere, in the region below the governor valve. If the throttle valve is partially closed, however, the drop in the volume of the flow of fuel (and change in its velocity?) thereby induced, tends to increase the vacuum, or to decrease the pressure below the governor valve, so that the functioning of the latter, i. e., the maintenance of its balance, is thereby disturbed, and it fails, or tends to fail, to govern the

operations of the engine so that a predetermined speed may not be exceeded.

In order to restore the conditions so disturbed, an element had to be supplied which would tend to move the governor valve as though the pressure below it had not been changed. That agency was added in the form of a piston moving laterally against the governor valve, which was actuated by atmospheric pressure. Thus the nearly atmospheric pressure formerly existing directly below the governor valve, though absent because of the change in position of the throttle valve, was in effect reinstated through the action of the piston which was exterior to the conduit. This is known as the "anti-steal" or the "throttle steal" element.

The foregoing is thought to portray, in plain language, the bare outline of the territory in which this controversy has been conducted.

The plaintiff's cause is based upon three patents: Hufford No. 1,537,944, Handy No. 1,584,929, and Bull No. 2,048,423.

The defendant's unpatented device is said to infringe upon them, and the pathway to adjudication is thought to lie through the wavering precincts of earlier appropriation, because not otherwise can the competing structures be understandingly compared.

The Handy patent (filed May 21, 1920, granted May 18, 1926) is for such a governor as has been discussed; i. e., a single unbalanced butterfly valve the closing effort of which is accelerated through the difference in pressures above and below; the effort is "substantially balanced at all positions" of the valve "when the motor is operating at a constant predetermined speed, and * * * said effort is over or under-balanced at other speeds."

The disclosure presently important is of a linkage between the valve and a spring which opposes the former's closing effort, so designed that the energy of the spring, which would otherwise be expended in a constant or linear aspect, is actually rendered variably effective in response to the changing demands made upon it, by the variable turning effort or torque of the valve.

The Hufford patent (filed August 22, 1923, granted May 19, 1925) is said to deal with a flow responsive valve, which manifestly is not of the type here involved. The complex mechanical arrangement of the valve itself does not require exposition. The important feature of the patent is the throttle steal device which it was the first to teach; its place in the plaintiff's case is to justify the presence of the latter's throttle steal assembly, and its adaptation to the combination shown in the third patent.

The Bull patent (filed June 8, 1929, granted July 21, 1936) is described as being for a "stabilizer for suction governors." It is in effect a combination of the structures of the first two patents; that is, the valve is of the butterfly type, with yielding means to offset its closing effort, and the throttle steal piston in mechanical association. The latter is said to augment the closing effort of the valve, to prevent fluttering of the valve, and to prevent stealing.

The discussion as to validity will be largely confined to the Handy patent, because the Hufford and Bull teachings are subordinate to it.

Handy No. 1,584,929: The claims in suit are 3 and 16, as follows:

"3. A governing device comprising in combination, a conduit, a valve in said conduit adapted to be actuated in the closing direction in accordance with the flow of fluid in the conduit, a spring, and means transmitting the force of said spring to oppose the closing movement of said valve, said means constructed and arranged to increase the effort exerted on the valve by the spring as the valve is moved in the closing direction to such an extent as to balance the closing effort on the valve in all positions thereof when the motor is running at a predetermined speed."

"16. A governing device for hydrocarbon motors comprising an intake conduit, an unbalanced butterfly valve therein, and a counterbalancing means connected to balance the turning effort of said valve at a predetermined speed of the motor including an arm secured to turn with said valve, yielding means acting on said arm having its point of action shifted radially as the arm turns to increase the effort of the yielding means on the valve as it closes."

The patentee states that the vacuum above the governor increases at an accelerated rate when the motor operates at a constant speed, which means that the closing effort of the valve similarly responds thereto, and that a spring which opposes that movement ordinarily offers a "gradually increasing resistance" which cannot offset the acceleration so described.

To enable such a spring to meet the kind of demand to which it is supposed to respond, a method of connecting the spring to the governor had been devised, whereby the resisting capacity of the spring could be employed in correspondence to that closing effort, namely: A cam was attached to the spring and another to the valve, and they are in contact; as the valve moves to a closing position, its cam moves clockwise; opposing it is the spring cam and the point of contact between them is the point at which the energy of the spring opposes the closing movement of the valve; it is a moving point, since the second cam also moves clockwise, and the point of contact changes as the cams move, and in obedience to the force exerted by the valve in its turning effort. As has been shown, that force is a variable, so that the resistance of the spring directly responds to the variability of the closing force or movement of the valve to which it is opposed.

In two respects therefore the plaintiff asserts that the patent taught something not previously disclosed in the art, namely, the variable closing tendency of the valve, and the means to oppose that tendency by a resistance which would variably correspond, in order that at any given position of the valve there would be opposed to it an arresting force which would hold it substantially in that position.

Reliance, to establish anticipation, is had upon: Benjamin No. 1,212,177 (application filed January 11, 1915, granted January 16, 1917); Stoeffel No. 1,230,337 (application filed August 17, 1916, granted June 19, 1917); Jennings No. 1,379,186 (application filed February 24, 1920, granted May 24, 1921); Pierce No. 1,461,993 (application filed October 31, 1919, granted July 17, 1923); Tondeur No. 277,156 (Belgian; application filed October 18, 1917), and Saxby (British) No. 3,326 of 1875. These citations are really directed to the Handy patent.

So far as Benjamin is concerned, the specifications and claims will be searched in vain for evidence that he was aware of the variable closing effort of his valve, i. e., torque, and the required variable offset to that, to be derived from his spring. His device was never manufactured and at best it must be classed as a paper patent the teachings of which are entirely theoretical. To meet that obvious situation, the defendant constructed, with partial fidelity to the drawings, two models which are assumed to embody substantially the first alternative structure described by Benjamin.

The extent to which they functioned when tested on the road is interesting, but of little value in assigning a definite status in the art to the Benjamin patent. That they could operate, one with an on center and the other with an off center valve, to somewhat restrict the fuel supply, may be granted for present purposes.

It is not the fact of operability but the nature and extent of disclosure which is of present import.

Benjamin's governor for gas engines employs a butterfly valve, but he does not say that it is unbalanced. I should suppose that the trifling difference in the dimensions of the two blades or sides, as shown by the drawing, is probably due to the draftsman's indication of perspective in showing the valve, its suspension, and linkage through a short pinioned arm to a rod connected with a piston which operates in a cylinder exterior to the conduit.

That piston moves laterally in response (a) to the variation between atmospheric pressure acting on its upper surface, and the pressure existing in the manifold adjacent to the valve, which is communicated through a passage opening into the cylinder wall, under the piston; and (b) to the force exerted against its under side by a spiral spring the base of which rests upon the base of the cylinder in which the piston moves. That base is penetrated by the piston rod which is coupled to the valve of the governor.

Benjamin explains the operation of the device as depending upon manifold suction (pressure) change which is communicated to the exterior cylinder and causes the piston to move: "This decrease of suction in the chamber 20 (the cylinder) will permit spring 24a to move the piston 19 to the right as shown in Fig. 1, until the lessening tension of the spring is just balanced by the suction on the piston 21." That language is unfortunate because there is but one piston numbered 19. Probably the word "at" should precede the number 21. The meaning is that the piston moves in response to change of pressure in the manifold, which affects the action of the spring to which the valve is coupled as explained.

The claims 1 to 7, inclusive, seem to be consistent with the foregoing, and to in-

volve additionally "manually controlled pneumatic means for controlling said governing means."

The control so described in claim 1, and less specifically in the others, refers to the passage leading from the manifold to the piston chamber, which is controlled in turn by another passage which "bleeds air," as the witness Bull expressed it, into the first mentioned passage; the latter is the agency for communicating the manifold pressure to the piston chamber. Therefore, since the fidelity of piston performance is subject to manipulation by the admission of atmospheric pressure, apparently the patent teaches a control of the governor valve solely through response to the exterior piston action, which may be in part at least responsive to manual actuation.

That does not deal with the subject-matter, nor is it an anticipation of Handy No. 1,594,929, or Bull No. 2,048,423, if those patents are presently understood. Nor of Hufford No. 1,537,944 as to the throttle steal element, which is the only aspect here involved, because Hufford (page 2, lines 71 et seq.) presents a clear statement of the conditions under which throttle steal is rendered possible by manipulation of the throttle valve, discussed above, and the means to compensate for the change in pressure below and above the governor valve by the action of the piston in the exterior chamber.

Benjamin did not disclose any knowledge of the presence of this problem, nor did he suggest a method of its solution.

His concept is not so portrayed as to render it clear that the passage which communicates the manifold pressure to his exterior piston chamber was intended to lie between the governor valve and the throttle valve. It is true that he refers to the movement of the latter (page 2, line 29) but its location is not shown in the drawing, nor discussed in the specifications.

It is found therefore that Benjamin did not anticipate.

Stoeffel No. 1,230,337 possesses the merit of brevity and clarity, which cannot be said for other patents in the case. It is urged against Handy No. 1,584,929, apparently because the plaintiff's witness Bull said that the difference in disclosure was one of degree. It is thought that he meant to refer to the teaching of the necessity for opposing the closing movement of the valve by a responsive force, which is common to the patents; and to the presence of a spring in each to accomplish that purpose.

If Stoeffel was aware of the variability of the closing force, he failed to mention it. Moreover, he prevented his valve from going to the wholly closed position by arresting full rotation by two interior structural impediments which need not be discussed, for neither exists by reason of any increasing effort on the part of the spring to meet the maximum of torque on the governing valve.

Stoeffel is found not to anticipate.

The patents to Jennings No. 1,379,186 and Pierce No. 1,461,933 may be considered together, for it is common ground that their disclosures are of the same type of governor, in that pressure changes manifested between the valve and the engine (i. e. "down stream" from the governor valve) are communicated to the valve, through a series of springs in Pierce, and a complex leverage in Jennings, so that the valve will respond to a variable force instead of a constant one, which would result from the absence of such a medium.

In Jennings, the manifold pressure is manifested in a diaphragm assemblage and therefrom impressed upon the valve by a lever system which is assumed to be effective.

In Pierce, the manifold pressure is communicated to a piston which, through a succession of springs, responsively operates the governor valve.

If the plaintiff's theory of those patents is understood—and it does not seem to be challenged—it is to the effect that fixing or predetermining the speed (R. P. M.) of a motor vehicle must take into consideration that changes in the load, i. e., increase or decrease in power required, necessarily affect the degree of vacuum in the intake conduit. This is what is understood by the expression that such vacuum is a function of the load.

If a governing speed is predetermined by adjusting the spring which opposes the valve's tendency to close in response to the vacuum between it and the engine, i. e., below the valve, allowance must be made to compensate *at* the valve (i. e. its opening) for the manifold vacuum *there* created as a result of load changes. This means that the spring must be capable of exerting its power upon the valve in a variable aspect,

or curved characteristic, instead of linearly or in a straight line spring effort. This was known to both Pierce and Jennings, and they provided for it in different ways.

Apparently, however, they were not dealing with the kind of valve shown in Handy, which is a governor valve, and not a carburetor throttle valve.

Pierce and Jennings had only one valve, which was not shown by them to be flow responsive, for each of theirs was a down stream device; that is, it moved in response to pressure existing in the manifold between it and the engine.

They did not show that they knew of any torque existing in the valve itself, resulting from the two forces heretofore stated, nor did they seek to offset those forces by the spring which Handy describes; it is the plaintiff's contention that Pierce and Jennings were conscious of a different problem to that apparent to Handy. Perhaps they were; perhaps it was only a different aspect of the same problem.

However this may be, it seems clear that Pierce and Jennings sought to control a valve by mechanical devices exterior to it, while Handy sought to offset a force or forces to be identified with the valve itself.

Whether there is actually present in the inventions announced in these respective patents such a difference of concept, and such a departure by Handy into territory not made familiar by Pierce and Jennings, is largely a matter of opinion, upon which differing views are inevitable.

The line of demarcation is rendered the more obscure because of Jennings' exposition of the variability of the closing effort of his valve. In that respect he displayed an understanding that was either hidden from Pierce (who was earlier) or assumed by him to be so well recognized as not to require discussion.

The explanation of that condition by Handy therefore cannot be accorded the status of discovery. The plaintiff's witness Bull insists that Pierce and Jennings were not dealing with torque, and yet it is difficult to follow that statement completely, since it is obvious that they understood the necessity for operating their valves by a variable force.

The plaintiff's argument characterizes the Pierce and Jennings governors as of "the static vacuum type" and quotes Pierce as saying "the force employed for adjusting the throttle is the variable static within the intake."

The correctness of the foregoing does not explain away the fact that the Handy governor, although a different thing as he portrays it, manifests its own torque in obedience in part to the vacuum between it and the engine. The down draft and up draft functioning of the two kinds of devices does nothing more than create a realization that the pressure changes are given different labels.

There is enough in common to render uncertain the task of delimiting the precise dimensions of these three patents, and that condition is enhanced by reference to the Handy file. Pierce was cited against it and successfully avoided, not on the theory here examined, but because it was argued that the Pierce governor would not function at all ranges within a predetermined speed.

This, of course, does not establish the unsoundness of the current argument, but since it was not advanced in solicitation it appears now as something of an afterthought. Perhaps broader understanding of the subject-matter has been brought into play.

It is concluded on this branch of the case, with some diffidence bred of a misgiving that complete understanding of the problem has not rewarded reflection and study, that Pierce and Jennings did not directly anticipate Handy, but that their disclosures are in such proximity to his that narrow and precise interpretation must be applied to the Handy patent.

It should be added that these patents do not involve the throttle steal element present in Hufford and in Bull, for they do not portray a governor valve capable of being somewhat disabled through the partial closure of an antecedent carburetor throttle valve.

Saxby (British) No. 3,326 (1875) presents a governor valve for steam engines, the closing effort of which is opposed by a plunger or piston the opposite ends of which are of different sizes, and the larger end receives the impact of the steam on the boiler side of the throttle valve, and the smaller end, the steam on the engine side of the throttle valve.

The throttle valve and the piston are in mechanical association through curved arms which apparently provide a moving point of contact.

220

That is probably the feature of construction which is thought to anticipate Handy.

For reasons appearing in the testimony, it is thought that Saxby is quite remote from the teachings of Handy, and his employment of a device which involves a radial change in the application of the piston control of the valve (if it functions at all) is not an adequate reason for discussing the subject herein.

Saxby does not anticipate.

Tondeur (Belgian) No. 277,156 is agreed to be a valid reference so far as the lack of publication is concerned. It deals with a method for increasing the supply of air to the engine cylinders of an air plane at high altitudes, where because of the rarefied nature of the atmosphere, artificial respiration, so to speak, must be resorted to. The device employs a butterfly valve, and its tendency to close is offset by a spring, and the point where its force becomes effective moves with the valve and in accordance with the changing turning effort thereof.

It is not a governor in the sense here involved; it is a device for increasing, not regulating, air plane speed at high altitudes by forcing a greater volume of air into the engine cylinders than would naturally enter; since the air at those heights is attenuated, volume must be increased so as to compensate for deficiency in density.

With that understanding, it becomes apparent that Tondeur is not concerned with the problems peculiar to Handy and Pierce and Jennings, for instance.

His mechanical structure between spring and valve does resemble that employed by Handy, but nothing is claimed in the latter for the mechanical means as such.

It is therefore concluded that Tondeur is not an anticipation.

The foregoing discussion has for its object a demonstration that neither the governor valve as taught by Handy, nor the throttle steal as taught by Hufford, nor the combination of those devices as set forth in Bull, have been anticipated in the constituency of the prior art upon which defendant relies. If the reasoning is sound, it follows that plaintiff's patents are valid. If it is unsound, the balance of the discussion touching infringement is, of course, superfluous.

The defendant's device, which for convenience will be called the Leibing governor, is a flow responsive governor, mounted in the conduit connecting the carburetor and the engine, between a carburetor throttle valve and the intake manifold.

The manufacturer openly conducted the defense, so that, where reference is hereinafter made to the defendant or its practice or structure, it is to be understood that the Leibing Company is so designated for convenience, and not the distributor, the nominal defendant.

The valve is to be distinguished from that of the plaintiff's, for it is not a single disc or elliptical shaped device, but a structure having two sections, or gates, so related that, when the valve is closed, the outside edges are in contact with the interior of the conduit and the inside edges lie against a partition or wall which is an integral part of the valve structure. The latter is of course parallel to the conduit so that closure, if desired, would involve four points of contact, two with the conduit and two with the inner partition.

The two wings or sections are of unequal size and conformation, and the assemblage is held in position off center, so that the valve is unbalanced. The larger of the two wings or vanes is curved, and the smaller is flat, which means that they are not parallel.

The design of the valve is such that characterization of it within recognized nomenclature would be hazardous, at best.

For instance, the plaintiff's witness Ray says that "it is not what is ordinarily called a butterfly valve; it is somewhat similar to a butterfly valve, but the passages are quite different. As it is opened the passages open up in the center as well as around the edges, and I wouldn't be in a position to say what torque would be developed by the air itself acting on such a valve."

Leibing, the inventor, in his patent No. 2,026,948, in referring to such a governor valve as shown in that patent drawing, refers to it as "of the pivoted or butterfly type."

In face of the obvious reluctance of these two informed persons to classify this valve with precision, there is no present disposition to enter where they fear to tread.

That the Leibing governor differs structurally from that of Handy and Bull, is too

obvious to require discussion. Whether that difference is of substance rather than form can be laid aside for the moment.

Turning now to the spring mechanism which is so devised as to offset the torque of the valve, it will be seen that the latter is connected by a shaft to an arm which moves with the valve; to that arm a straight line spring is attached at about the center of the former and, when the valve is open, a line drawn from the pin holding the spring would pass just under the shaft which connects the valve to the arm. As the valve moves toward closing, the arm is carried downwardly and the spring moves with it from its anchorage at the end which is remote from the said arm.

The stretching of[3] the spring provides the force which opposes the closing movement of the valve; why that spring force has a curved characteristic to offset the torque of the valve as it does, is the subject of interesting discussion throughout the case and in the briefs.

The plaintiff asserts that what really takes place is equivalent to the shifting of the point of contact between the valve cam arm and the spring cam arm in Handy (and the valve arm and the spring roller arm in Bull which is not mechanically different), while the defendant argues that the mechanical actions are different because there is no radial extension or movement of the point at which the resisting power becomes effective, i. e., the point of application of the spring force, involved in the operation of the Leibing device.

It is to be observed that the result produced by the defendant's mechanism is successful; that is to say, the variable torque in its governor is offset by a variable spring resistance.

It is unnecessary to discuss how closely the latter device can govern, for that is a matter of adjustment with respect to each engine and the user's requirements.

For present purposes, it is considered that the two governors are equally effective.

The plaintiff's point of application of the spring power is movable, visible and the result of the interaction of the valve arm upon the spring arm.

The defendant's point of application is invisible, changing, and is established in theory at the intersection of the prolongation of the line of force of the spring with a perpendicular to it drawn from the center of rotation of what may be called the valve arm.

In the mechanical sense, these are leverage devices, and the plaintiff argues that Handy's patent embraced all such, when employed to translate a straight line spring action into a curved characteristic to offset the closing effort of a governor valve.

It is considered that this construction of the claims in issue would be too broad, in view of the restrictions necessarily to be imposed upon Handy for reasons heretofore stated.

Handy's claim 3 deals with " * * * means transmitting the force of said spring to oppose the closing movement of said valve, said means constructed to increase the effort exerted on the valve by the spring * * * to such an extent as to balance the closing effort on the valve at all positions * * *."

In the first place, the claim is mistaken in form because the spring effort is not increased. The energy of the spring remains the same notwithstanding the interaction of the cam arms; its power is modified from a straight line expression to that of a curve, as has been seen.

As to the "means" referred to, it is not thought that a wide range of equivalency was requisitioned by the patentee; namely, *any* coupling employing leverage between a governor valve and a straight line spring which would enable the latter to function as required to offset the torque of the valve, but only one in which a valve arm and a spring arm, such as in Bull, would cooperate so as to present a visible movable point of application.

The concept of coordinating variable valve turning effort, to the means to offset it, was not new with Handy. Jennings expounded and employed it, for instance, and whether he attributed the valve action to static pressure in the manifold, or to that phenomenon which Handy describes, is presently unimportant.

Jennings employed leverage, and so did Handy; if the latter's use of the principle is good against the former, the defendant's embodiment of it was available as against Handy.

Handy's claim 16 embraces, in addition to the intake conduit:

(a) "an unbalanced butterfly valve therein"

222

(b) "a counterbalancing means connected to balance the turning effort of said valve"

(c) "an arm secured to turn with said valve"

(d) "yielding means acting on said arm having its point of action shifted radially as the arm turns to increase the effort of the yielding means on the valve as it closes."

The defendant does not use a butterfly valve, within the definition agreed upon. The claim is not for a valve "of the butterfly type" and, if it were, the standard wherewith to determine what that expression would mean, is lacking.

The elements (b) and (c) above listed are clearly present in the defendant's structure.

The last requirement somewhat expands and particularizes the "means" referred to in claim 3.

It will be seen that the yielding means taught by Handy "acting on said (valve) arm" must be the spring arm; and that "its point of action" is shifted radially. According to the grammatical sense, the said point of action is that of the spring arm.

Leibing has no spring arm. He has a spring which is attached to the valve arm; that spring stretches and moves as though it were itself the radius of a circle; it has no point of action save the pin which attaches it to the valve arm.

The plaintiff argues that the point of action between the spring and the valve arm moves along the perpendicular erected as has been described, and this is probably true, although it cannot be seen. Since that movement is along the perpendicular, and not along the line of action of the spring, it is the point of action of the valve arm and not of the spring.

The yielding means taught by Handy reside in the spring arm; that practiced by Leibing, in the valve arm.

This may appear to constitute a refinement of interpretation, but is thought to be based upon the evidence. Bull says that the product of the spring pressure and the increasing arm on which the spring tension is applied gives the curve to the Leibing offset to the torque of the valve; and as this must be deemed the most favorable statement of the plaintiff's theory of infringement, it is accepted for present purposes. It exposes the mechanical distinction between the two structures in this respect; it is small but significant, because Handy was not a pioneer, as has been shown. The disclosure of his mechanism was not of even a new association of cam arms to accomplish his purpose, and it is thought that there is nothing unjust in denying to him a range of equivalency which would embrace Leibing's solution of this particular problem.

■ It is concluded therefore that the defendant's structure does not embody the first and fourth elements of claim 16 of Handy, and does not infringe either of the claims in suit.

With regard to the incorporation by defendant of the anti-steal piston as taught by Hufford, it is thought that infringement is too clear to call for extended discussion.

He taught a flow responsive governor valve, of an entirely different type from those in this case; its closing effort was modified in response to pressure change in the conduit below that valve, due to the partial closure of the carburetor throttle valve by a driver who desired thus to disable the governing action of the governor valve. This result was achieved by providing an exterior cylinder and piston, the rod of which was in mechanical association with the governor valve; the piston moved in response to the atmospheric pressure which was conducted to the piston and caused it to thrust against a regulating spring so as to cause the rod to move against the member which constituted the connection with the valve. The effect of its functioning was to supply to the governor valve the same component of pressure which was present when the carburetor throttle valve was in its widest open position.

That action was not caused except in response to pressure change below the governor valve; that change was communicated to the upper section of the exterior cylinder through a port; in response to that change the piston moved upward, and through the linkage with the governor valve the function of the latter was reestablished by reducing the fuel flow which affected its turning movement.

That concept of Hufford is not suggested in anything earlier than the first patent in suit, and the effort to show that Benjamin, Pierce and Jennings taught what the defendant practices is labored and unconvincing.

If Benjamin was aware of the possibility of throttle steal, he kept the knowledge to himself.

Pierce and Jennings were teaching a valve the operation of which was not subject to the throttle steal condition because of the absence in their structures of the carburetor throttle valve.

Defendant's adoption of the Hufford exterior piston, spring and assembly to prevent throttle steal is plain and unmistakable. The only possible difference lies in the fact that the piston rod is not in permanent mechanical relation to the valve, but the rod cannot function unless it strikes a spur on the valve, the only possible purpose of which is to receive the thrust of the rod. In other words, when the piston functions, it is in physical contact with the valve; when it is not called into play, it makes no difference that there is a space between the conduit end of the rod and the valve.

There is such a mechanical identity between the valve governing means taught by Hufford and practiced by Leibing that it is found that both claims 16 and 20 of the Hufford patent are infringed by the Leibing governor, Exhibit 5.

As to infringement of the Bull patent, but little comment is necessary. Claim 17 is in issue, and as to the throttle steal element there would be no difficulty in finding that the defendant's structure offends; in combination with that, however, are the "resilient means arranged to oppose the closing movement of the said valve," etc.

Those means are mechanically the same as taught by Handy, and for reasons which have been stated it is not considered that the equivalent thereof are embodied in the Leibing structure.

It follows that infringement of this claim of the Bull patent has not been established.

The foregoing contains in narrative form the findings and conclusions of the court, and is thought to comply with the requirements of Equity Rule 70½, 28 U.S. C.A. following section 723. If counsel are otherwise persuaded, findings and conclusions in accordance with what has been written may be settled on notice. See Equity Rule 11 of this Court.

Settle decree to provide that plaintiff's patents are valid, and that defendant's structure infringes Hufford No. 1,537,944, but does not infringe Handy No. 1,584,929

or Bull No. 2,048,423 as to the claims in suit. No costs will be awarded to either party. Injunction, accounting and damages awarded against defendant as to the Hufford infringement.